# In the United States Court of Federal Claims

|  |  |
|---|---|
| JESUS JIMENEZ,<br><br>              Plaintiff,<br><br>     v.<br><br>THE UNITED STATES,<br><br>              Defendant. | No. 23-cv-0129<br>(Filed:  January 27, 2026) |

Timothy J. Turner, Whitcomb, Selinsky, PC, Denver, CO, for Plaintiff.

Elinor Joung Kim, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Patricia M. McCarthy, Director, William J. Grimaldi, Assistant Director and Carlos A. Pagan, Lieutenant, Office of the Judge Advocate General, General Litigation Division, United States Navy, Washington, D.C.

## **MEMORANDUM OPINION**

Meriweather, Judge.

　　Plaintiff, Jesus Jimenez ("Mr. Jimenez"), a former United States Naval Officer, challenges the Board for the Correction of Naval Record's ("BCNR" or "Board") denial of his application for correction of his military records and his non-selection for continued service. Mr. Jimenez alleges the BCNR failed to properly consider his experiences of military sexual trauma and resulting post-traumatic stress disorder ("PTSD"). Mr. Jimenez requests that this Court either correct his military records and modify his retirement status to reflect that he was medically discharged or reverse the Navy's decision not to continue his service and reinstate him on active-duty service.[1] Compl. ¶ 1, ECF No. 1. The parties have filed Cross-Motions for Judgment on the Administrative Record, and the United States filed a Motion to Dismiss. *See generally* Pl.'s Mot. for J. on the Administrative Record ("Pl.'s Mot."), ECF No. 29; Def.'s Mot. & Resp.  In his Motion for Judgment on the Administrative Record, Mr. Jimenez argues that the Board's decision on remand—denying him disability retirement, or alternatively, denying him

---

[1] The Court reads Mr. Jimenez's request for reinstatement as a "request for a special board to reconsider his non-continuation." Def.'s Mot. to Dismiss and Cross-Mot. for J. on the Administrative Record & Resp. to Pl.'s Mot. for J. on the Administrative Record ("Def.'s Mot. & Resp.") at 12 n.2, ECF No. 30.

the ability to continue in active-duty service—is arbitrary and capricious, unsupported by either "substantial evidence" or the totality of the record, and not in accordance with applicable Navy policy and regulations.  Pl.'s Mot. at 12–19.  The United States filed a Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record, arguing that (1) this Court lacks subject-matter jurisdiction over Mr. Jimenez's disability retirement pay claim; and (2) BCNR's non-continuation decision is supported by substantial evidence.  Def.'s Mot. & Resp. at 2.

Having reviewed the relevant filings[2] and administrative record,[3] the law, and for the reasons explained herein, the Court **GRANTED IN PART** the United States' Motion to Dismiss and Cross-Motion for Judgment on the Administrative Record.  *See* Order, ECF No. 37.  The Court also **GRANTED IN PART** Mr. Jimenez's Motion for Judgment on the Administrative Record.  *Id*.  This Opinion sets for the reasoning for that ruling.  The Court hereby **REMANDS** the case back to the Board for its consideration of all the record evidence and any additional evidence that Mr. Jimenez may submit or additional claims he may bring in light of this Opinion.

## BACKGROUND

### A.   Statutory and Regulatory Framework

The United States Navy has an "up-or-out" policy for certain officers.  Active-duty officers who are lieutenants or lieutenant commanders have two opportunities to be selected for promotion to the next higher grade.  *See* 10 U.S.C. § 632.  If they are passed over for promotion twice and are not on a list of officers being recommended for promotion, they generally must be discharged or retired from service.  *See id.* § 632(a)(1), (2).  The discharge can be delayed if the officer is within two years of qualifying for certain types of retirement.  *Id.* § 632(a)(3).  Officers who have not yet completed their active duty service obligation will be retained until they complete that service obligation unless the Secretary of the Navy determines that would be inconsistent with the Navy's best interest.  *Id.* § 632(c).

---

[2] The following filings are relevant to this Order: Compl., ECF No 1; Order Remanding Case to Board for Correction of Naval Records ("Order"), ECF No. 10; Notice of Filing of Administrative Record, Pt. 1–4 ("Administrative Record") (*see infra*, note 3), ECF Nos. 20–26; Pl.'s Mot., ECF No. 29; Def.'s Mot. & Resp., ECF No. 30; Pl.'s Resp. to Def.'s Mot. to Dismiss and Mot. for J. on the Administrative Record and Reply to Def.'s Resp. to Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Resp. & Reply"), ECF No. 33; Def.'s Reply in Support of its Mot. to Dismiss & Cross Mot. for Judgment on the Administrative Record ("Def.'s Reply"), ECF No. 34.  Throughout, page citations to documents in the record refer to the document's original pagination, unless the page is designated with an asterisk (*e.g.*, *1), in which case the reference is to the pagination assigned by PACER/ECF.

[3] "JJ___" or "SAR___" refer to pages of the administrative record as paginated and certified by the agency.  The United States filed the administrative record on March 29, 2024 "in separate docket entries due to limits of upload capacity on the Court's electronic (ECF) system."  Def.'s Mot. & Resp. at 1 n.1.

"Subject to the needs of the service," an officer who otherwise would be subject to an involuntary discharge or retirement under 10 U.S.C. § 632 can continue on active duty if a selection board selects the officer for continuation. 10 U.S.C. § 637. The Secretary of the relevant military department must approve any selection board's continuation decision. *Id.* § 637(c). The statute limits the duration of a continuation of service, depending on the grade of the officer and any subsequent promotion. *Id.* § 637(a)(2), (3), (4).

A Naval officer who is dissatisfied with an up-or-out involuntary discharge or retirement can seek reconsideration of that decision. Specifically, the service member can request that the Secretary of the Navy convene a special board to consider whether the officer should have been continued on active duty. *See id.* § 628(b)(1).

### B. Factual Background

Mr. Jimenez, a former United States Navy lieutenant command (O-4 grade) and Foreign Area Officer ("FAO"), served a total of 15 years, 9 months, and 16 days on active duty in the United States Navy until his honorable discharge on August 31, 2020. *See* JJ 666–67. Mr. Jimenez was discharged under the Navy's "up-or-out" promotion system after he was twice passed over for promotion to the rank of Commander (O-5), JJ 185, and subsequently also was not selected for continuation on active duty. *See* SAR 240–41.

Until approximately 2015, Mr. Jimenez had a commendable Navy career. *See* JJ 75. Mr. Jimenez received numerous awards for his service and was often applauded by his superiors for his "leadership, dedication, intelligence, commitment, enthusiasm, [and] professionalism." Pl.'s Mot. at 2 (citing JJ 75; JJ 102–168). It is undisputed that on December 14, 2012, while assigned to United Stated Navy Forces Europe/Africa ("CNE"), Mr. Jimenez was the survivor of an egregious workplace sexual assault. *See* SAR 494; SAR 507. During that incident, a retired Navy captain approached Mr. Jimenez, who was sitting at his desk, in front of multiple witnesses, and "rubbed his penis on Mr. Jimenez's arm in a self-stimulating manner before bumping Mr. Jimenez's chair in a sexually suggestive manner and stating 'I'm horny.'" Def.'s Mot. & Resp. at 3, n.1 (citing JJ 519; JJ 521); *see also* SAR 507 (same). It is equally undisputed that, following this assault, the Navy began documenting a series of incidents in which Mr. Jimenez behaved disrespectfully and insubordinately to his superior officers. *See* SAR 152–54; SAR 666–82. The parties disagree over how to characterize this pattern of poor behavior—Mr. Jimenez maintains that he was *not* insubordinate, and that any disrespectful behavior was actually attributable to his supervisors' retaliatory action (either because of his race or because of his status as a sexual assault survivor) and "his worsening mental health" following his assault. Pl.'s Mot. at 3. By contrast, the Navy contends that there is sufficient evidence of insubordination, and that on this record, there is no nexus between Mr. Jimenez's "worsening mental health," any supposed retaliation, and the behavior at issue.

In 2019, after Mr. Jimenez was twice passed over for promotion, the Fiscal Year ("FY") 2019 Navy, Active Duty, Lieutenant Commander, Line Special Duty Officer, Foreign Area, Continuation Selection Board ("CSB") initially recommended that he be continued in active duty service. SAR 3; *see also* Compl. ¶ 39. However, this initial continuation recommendation was withheld pending review of certain adverse information that was not available at the time of the

3

original CSB's review.  *See* JJ 181–83.  As part of the post-CSB screening process for officers who, like Mr. Jimenez, were twice not selected for promotion, but initially recommended for continuance, Department of Defense ("DoD") and Navy policies mandate review of all investigative files for any adverse or reportable information before deciding whether to continue that officer on active duty.  *See* SAR 8; SECNAVINST 1920.7C ¶ 6.a.6; DoDI 1320.04, encl. 4, ¶ 1.a (App'x 29).  Here, that post-CSB screening process revealed investigative files outside Mr. Jimenez's Official Military Personnel File ("OMPF") that contained adverse information.  *See* SAR 8.

Those investigative files revealed that Mr. Jimenez behaved disrespectfully and insubordinately during his joint-duty assignment at the United States Military Observer Group-Washington ("USMOG-W") between March 2015 and June 2016.  SAR 152–54; SAR 666–82.  Counseling statements and memoranda from Mr. Jimenez's commander, his direct supervisor, and the Commander, USMOG-W indicated that during Mr. Jimenez's assignment at USMOG-W, he exhibited a pattern of poor behavior including: failure to follow instructions; inability to receive constructive feedback; and argumentative, dismissive, and insubordinate conduct directed at his superior officers.  *See* SAR 22–23 (noting that Mr. Jimenez (1) "failed to follow instructions to coordinate the daily accountability of US personnel in Haiti"; (2) "boasted that [he] gave [his superior officer] a "piece of [his] mind"; (3) "threw down a leave packet on the desk of a [Lieutenant Colonel] and said "process this"; and (4) "became aggressive about the presence of a cell phone in a controlled area"); SAR 671 ("During [a] Haiti trip, [Mr. Jimenez] abruptly walked away from [the Commander] and later obstinately refused to take official photos . . . as [] requested.").  One such incident of poor behavior led to an informal investigation which concluded that Mr. Jimenez disrespected a superior officer in violation of Article 89, Uniform Code of Military Justice.  *See* SAR 674–75.  Although no punitive or adverse administrative action was taken because of that investigation, Mr. Jimenez was issued a letter of caution, which advised that "[his] conduct reinforc[ed] [his] underlying unwillingness [and] inability to accept responsibility and receive constructive feedback" and that "[his] judgment and conduct [was] both substandard and unacceptable."  SAR 669.

Because of Mr. Jimenez's behavior, the Commander, USMOG-W initially sought Mr. Jimenez's detachment for cause ("DFC") with prejudice due to "misconduct and unsatisfactory performance of duty."  Compl. ¶ 32.  Mr. Jimenez provided a statement in response to this DFC request, wherein he disputed the allegations of insubordination and noted that the "DFC request came after more than 15 years of successful service, and after two stellar [Fitness Reports ("FITREPs")] from two different USMOG-W Commanders."  *Id.* ¶ 33.  The Commander, USMOG-W subsequently revised his DFC request and instead requested that Mr. Jimenez be returned to the Navy without prejudice for reassignment.  *Id.* ¶ 36.  On June 27, 2016, Mr. Jimenez was returned to the Navy for reassignment.  *See* JJ 1278.

Mr. Jimenez was next assigned to the Defense Intelligence Agency ("DIA").  *See* Compl. ¶ 37.  During this assignment, the Commander, DIA, Navy Element prepared a negative endorsement to Mr. Jimenez's request to be continued on active duty pursuant to his initial selection for continuation by the CSB.  *See* SAR 646.  Although the Commander, DIA, Navy Element acknowledged that Mr. Jimenez "has, at times, demonstrated an ability to excel" the Commander ultimately concluded that "[Mr. Jimenez's] performance has been marred by . . .

4

actions that have detracted from the mission, impacting not only his assigned work-center, but the overall command." *Id.* ("[D]ue to interpersonal issues with his assigned chain of command(s), [Mr. Jimenez] has had to operate in three different work-centers."). That Commander reasoned that he could not recommend continuation because Mr. Jimenez's return to the Navy from his previous USMOG-W assignment precluded any future joint-duty assignment, which would "impede [the Navy's] ability to effectively assign [Mr.] Jimenez [to] applicable FAO assignments as almost 50% of the FAO['s] [assignments] are [j]oint." *Id.*

On September 18, 2019, the Deputy Chief of Naval Operations ("DCNO-N1") recommended denying Mr. Jimenez's continuation on active duty. *See* SAR 240–41. "After reviewing the totality of [the allegations of insubordinate behavior] and [] [Mr.] Jimenez's overall performance record," the DCNO-NI concluded that "continuing [Mr. Jimenez] is not in the best interest of the Navy." *Id.* The DCNO-NI reasoned that a "composite review of [] [Mr. Jimenez's record], his multiple incidents of disrespect towards seniors, as well as his consistently below-average military bearing and performance traits, warrant disapproval of his continuation." *Id.* On February 11, 2020, the Secretary of the Navy ("SECNAV") approved the DCNO-N1's recommendation, and on February 18, 2020, Mr. Jimenez received notice that his name was removed from the FY 2019 continuation list. *See* SAR 240–41. Although Mr. Jimenez submitted multiple requests for reconsideration of the Navy's decision not to continue his service (the "non-continuation decision") in multiple fora (including a Presidential inquiry), all such requests were reviewed, but ultimately denied. *See* SAR 158–59.

Effective September 1, 2020, the day after Mr. Jimenez's discharge, the Department of Veterans Affairs ("VA") granted Mr. Jimenez a 50 percent disability rating for "other specified trauma and stressor related disorder." SAR 718–19. The VA stated that because "there is factual evidence of the [sexual assault] as claimed, military sexual trauma is conceded." *Id.* ("There is evidence of continuity of symptoms from service to the present []. Therefore, service connection for other specified trauma and stressor related disorder is granted.") However, the VA declined to grant a higher evaluation of 70 percent because Mr. Jimenez failed to show any evidence of "occupational or social impairment, with deficiencies in most areas such as work, school, family relations, judgment, thinking, or mood." *Id.* The VA further denied a disability rating for "PTSD, anxiety, and acute stress reaction," concluding that there was insufficient evidence to support such a diagnosis based on Mr. Jimenez's claimed symptomology. *See id.*

### C. Procedural Background

Following his discharge, Mr. Jimenez submitted three applications to the BCNR alternatively requesting, among other relief, (1) reversal of the Navy's non-continuation decision (*i.e.*, convening of a special board to reconsider the Navy's non-continuation decision); (2) reinstatement in the Navy; or (3) early retirement. *See* SAR 228–30; SAR 149–67; SAR 1–10. Importantly, Mr. Jimenez never directly sought review of his claim to entitlement to disability retirement pay and benefits in any of these BCNR applications. In all three decisions, BCNR concluded that there was no error or injustice warranting relief in Mr. Jimenez's case.

### 1. BCNR's First Decision (Docket No. 1731-20)

In his February 26, 2020 application, Mr. Jimenez requested: (1) reversal of the Navy's non-continuation decision; (2) removal of an adverse punitive code from his OPMF; and, alternatively, (3) early retirement. *See* JJ 577. In this first application, Mr. Jimenez neither sought disability pay or retirement benefits nor presented any evidence of his 2012 sexual assault or his VA ratings. Based on the then-presently available record evidence, the BCNR concluded that (1) the Navy's non-continuation decision did not reflect any error; and (2) Mr. Jimenez did not qualify for retirement at the time of his discharge because he had less than 20 years of total active-duty service and the Temporary Early Retirement Authority ("TERA") was not in effect at the time of Mr. Jimenez's discharge. *See* SAR 229–30.

### 2. BCNR's Second Decision (Docket No. 5524-21)

On January 5, 2021, Mr. Jimenez submitted a second application to the BCNR wherein he requested: (1) that the BCNR convene a special board to reconsider the Navy's non-continuation decision; (2) reinstatement in the Navy; and (3) confirmation of his years of service completed to qualify for early retirement. *See* SAR 210–11. Alternatively, Mr. Jimenez also requested (1) retirement pursuant to TERA or retirement as a lieutenant commander with at least 15 years and 6 months of service; and (2) that the Navy convene a special board to reconsider his eligibility for the Reserve Oath of Office. *See* SAR 202–03, 218.

Within this application, Mr. Jimenez presented evidence of his 2012 sexual assault and submitted a redacted excerpt of the VA rating, asserting that the BCNR had previously failed to afford him due consideration as a sexual assault survivor with a documented military sexual trauma condition. *Id.* Again, Mr. Jimenez did not request disability retirement. *See id.*

In a 19-page opinion, containing 42 individual enclosures, including an advisory opinion from the Navy Personnel Command, Office of Legal Counsel, the BCNR concluded that the Navy had not erred by deciding not to continue Mr. Jimenez's service. *See* SAR 149–67.

### 3. BCNR's Third Decision (Docket No. 5260-23) and Current Posture

Following the Court's Order remanding the case to the BCNR, ECF No. 10, Mr. Jimenez submitted a third application for the BCNR's reconsideration, appending additional materials (*i.e.*, the unredacted VA ratings) and putting forth new arguments. *See* SAR 69–76. Although Mr. Jimenez still did not directly request disability retirement pay or benefits in this third application, he did, at the end of his application, note he was seeking "and/or for the correction of military records to reflect medical discharge." SAR 69.

On remand, the BCNR incorporated its previous findings, reviewed the record de novo, considered all the additional evidence and documentation submitted by Mr. Jimenez in support of his newest application, and further sought an additional advisory opinion by a licensed clinical psychologist specializing in sexual assault trauma. *See* SAR 1–10. And although the Navy argues that DoD's "liberal consideration" standard is inapplicable to this case, the BCNR nonetheless stated that it afforded Mr. Jimenez's claimed military sexual trauma and alleged

6

PTSD "liberal consideration." *See* SAR 6–8. The BCNR again concluded that there was no error in denying Mr. Jimenez's request to reconsider the Navy's non-continuation decision, reasoning that neither Mr. Jimenez's military sexual trauma nor alleged PTSD mitigated SECNAV's determination that Mr. Jimenez's continued service was not in the best interest of the Navy. *See* SAR 7–10.

Now, in his Motion for Judgment on the Administrative Record, Mr. Jimenez contends that the Board's decision was arbitrary and capricious, an abuse of discretion, and not supported by substantial evidence. Pl.'s Mot. at 2. First, Mr. Jimenez contends that he is entitled to disability retirement under 10 U.S.C. § 1201, and that the BCNR's denial of those benefits was contrary to the law because the Board (1) erroneously "never conducted the mandatory fitness determinations" to assess whether he was eligible for medical retirement; and (2) failed to consider his military sexual trauma and PTSD under the requisite "liberal consideration" standard. Pl.'s Mot. at 12–19. Mr. Jimenez alternatively argues that if the Court holds that he is not entitled to disability retirement, then the Board's denial of his request to continue on active-duty service is also arbitrary because that denial was improperly "based entirely" on "minor[, undocumented] allegations [of misconduct] from 2016," rather than the "totality of [Mr. Jimenez's military] record." *Id.*

The United States asserts that this Court lacks subject-matter jurisdiction over Mr. Jimenez's disability retirement pay claim "because a first competent board has not yet evaluated [that claim]," and requests that the Court deny Mr. Jimenez's Motion in its entirety because the BCNR's non-continuation decision is supported by substantial evidence. Def.'s Mot. & Resp. at 2.

## LEGAL STANDARD

"On a motion for judgment on the administrative record pursuant to [Court of Federal Claims Rule ("RCFC")] 52.1, the Court's review is limited to the administrative record, and the Court makes findings of fact as if it were conducting a trial on a paper record." *Daniels v. United States*, 163 Fed. Cl. 363, 376 (2022) (citing *Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed. Cir. 2005)). The Court "must determine whether a party has met its burden of proof based on the evidence [] within the administrative record." *Id.* (citing *Bannum*, 404 F.3d at 1355). "Genuine issues of material fact will not foreclose judgment on the administrative record." *Id.*

The Administrative Procedure Act ("APA") standard of review governs challenges to military record corrections board decisions. *Walls v. United States*, 582 F.3d 1358, 1367 (Fed. Cir. 2009). However, the scope of the Court's review is deferential as "responsibility for determining who is fit or unfit to serve . . . is not a judicial province; and [this Court] cannot substitute [its] judgment for that of the military [boards] when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983); *see also Hassay v. United States*, 150 Fed. Cl. 467, 477 (2020). Thus, the Court must uphold a board's decision "unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010); *see also Baude v. United States*, 955 F.3d 1290, 1298 (Fed. Cir. 2020) ("We therefore will not disturb the

decision of the [Board] denying a special board to correct the decision of the Selective Continuation Board unless it is arbitrary [or] capricious.") (internal quotations omitted).

The Court does not reweigh the evidence but only determines whether "the conclusion being reviewed is supported by substantial evidence." *Heisig*, 719 F.2d 1157. It is well settled that "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 619 (1996). The substantial evidence standard "is a low evidentiary threshold" that requires just "more than a mere scintilla" of evidence. *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1379 (Fed. Cir. 2009) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Moreover, the Court presumes that a board's actions are valid and performed "according to the regulations and considered all of [plaintiff's] records." *Melendez Camilo v. United States*, 642 F.3d 1040, 1045 (Fed. Cir. 2011); *see also Dodson v. United States*, 988 F.2d 1199, 1204 (Fed. Cir. 1993) ("[M]ilitary administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs.").

## DISCUSSION

### I. The Court Lacks Subject-Matter Jurisdiction Over Mr. Jimenez's Disability Retirement Pay Claim.

Mr. Jimenez brings his claims under the Tucker Act, 28 U.S.C. § 1491(a)(1), which authorizes certain actions for monetary relief against the United States to be brought in this Court and waives the United States' sovereign immunity for those actions. *Chambers v. United States*, 417 F.3d 1218, 1223 (Fed. Cir. 2005); *Martinez v. United States*, 333 F.3d 1295, 1303 (Fed. Cir. 2003). But the Tucker Act is "only a jurisdictional statute," *United States v. Testan*, 424 U.S. 392, 398 (1976), and "does not itself provide the substantive cause of action." *Chambers*, 417 F.3d at 1223. Therefore, for a case to be within the Court's limited jurisdiction, a plaintiff must identify a separate source of substantive law which "can fairly be interpreted as mandating compensation by the federal government for the damage sustained"—commonly referred to as a "money-mandating statute." *Doe v. United States*, 463 F.3d 1314, 1324 (Fed. Cir. 2006); *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). In this case, Mr. Jimenez claims entitlement to military disability pay under 10 U.S.C. § 1202, a money-mandating statute. *See Chambers*, 417 F.3d at 1223; *Martinez*, 333 F.3d at 1303.

Generally, a Tucker Act claim accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit" under the applicable money-mandating statute. *Martinez*, 333 F.3d at 1303 (collecting cases) (noting a Tucker Act claim accrues when "all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here"). And it is well settled that in a military discharge case, "the plaintiff's cause of action for back pay accrues at the time of the plaintiff's discharge." *Id.* (collecting cases) ("Th[e] [Federal Circuit] and the Court of Claims have frequently addressed and rejected the argument that the cause of action for unlawful discharge does not accrue until the service member seeks relief from a correction board and th[at] [] board enters a final decision denying relief."). But, unlike a wrongful discharge claim, a claim for entitlement to disability retirement pay generally does not accrue until the appropriate military board either finally denies such a

8

claim or refuses to hear it. *Chambers*, 417 F.3d at 1224 ("The decision by the first statutorily authorized board that hears or refuses to hear the [disability retirement pay] claim invokes the statute of limitations.") (citing *Real v. United States*, 906 F.2d 1557, 1560 (Fed. Cir. 1990)); *see Furlong v. United States*, 138 Cl. Ct. 843, 846 (1957).

This difference in accrual between claims for unlawful discharge and military retirement pay is attributable to those claims' respective money-mandating statutes. *Id.* Claims for discharge accrue "at one time, once and for all, on the date of discharge," because neither the Tucker Act, nor the underlying money-mandating statute, require exhaustion of administrative remedies—appeal to a correction board is permissive, not mandatory. *Martinez*, 333 F.3d at 1304. Accordingly, the former service member can seek immediate redress in this Court on an unlawful discharge claim, and "the failure to seek relief from a correction board . . . does not prevent [that] claim from accruing." *Id.* at 1304, 1306 (noting that congressional intent supports "this court's consistent interpretation of the correction board legislation as creating a permissive avenue for collateral administrative relief, not a mandatory prerequisite to suit"). By contrast, under 10 U.S.C. § 1202, former service members must exhaust administrative remedies before suing under the Tucker Act—appeal to a correction board is mandatory, not permissive. *Friedman v. United States*, 159 Cl. Ct. 1, 13–15 (1962); *Furlong v. United States*, 138 Ct. Cl. 843, 845–46 (1957). Thus, "the Court of Federal Claims has no jurisdiction over disability retirement claims until a military board evaluates a service member's "entitlement to such retirement in the first instance." *Chambers*, 417 F.3d at 1225.

Here, the United States argues that Mr. Jimenez's claim for disability retirement has not yet accrued and thus must be dismissed for lack of subject-matter jurisdiction. Def.'s Mot. & Resp. at 17. Specifically, the United States contends that Mr. Jimenez's disability claim has not yet accrued because a Physical Evaluation Board ("PEB") never evaluated his fitness for duty nor did he pursue that disability retirement claim before a competent board. *Id.* The Court agrees.

First, it is undisputed that the Navy failed to conduct a fitness determination at any point before Mr. Jimenez's discharge.[4] Pl.'s Mot. at 16 ("[T]here is no record of any fitness determination conducted."); Def.'s Mot. & Resp. at 17 ("Nor does the record reflect a PEB evaluation [] on this issue.") (citing SAR 1–10, 149, 63, 228–34). As both *Chambers* and *Friedman* held, when a service member is discharged without a PEB hearing, that service member's disability retirement claims do not accrue until the [BCNR], "the first competent board, finally denie[s] his claim." *Chambers*, 417 F.3d at 1227 ("This Court began by restating the general rule [] that if [a] service member had neither requested nor offered consideration by a disability board prior to discharge, the later denial of his petition by a corrections board, not his

---

[4] On this point, Mr. Jimenez argues that the Navy's failure to refer him for a PEB fitness determination was not in accordance with Navy policy and thus itself evidence that the Navy acted arbitrarily in denying his claims. Pl.'s Mot. at 16 ("[T]he Navy and the Board have never conducted the mandatory fitness determination as set forth in SECNAVINST 1850.4E and any denial of medical disability retirement pay must necessarily be arbitrary and capricious.") Because the Court holds that it lacks subject-matter jurisdiction over Mr. Jimenez's disability retirement pay claim, it declines to consider this argument as applied to that claim.

discharge, triggers the statute of limitations."); *Friedman*, 159 Cl. Ct. at 24 ("[W]here the claimant has not had or sought a Retiring Board, his claim does not accrue until final action by the Correction Board (which in that instance stands in the place of the retiring board as the proper tribunal to determine eligibility for disability retirement)."); *see also LaBonte v. United States*, 43 F.4th 1357, 1364 n.4 (Fed. Cir. 2022).

Second, the BCNR did not review, refuse to hear, or otherwise deny Mr. Jimenez's disability retirement pay claim in the first instance. Rather, the totality of the record shows that Mr. Jimenez never *clearly* brought his disability retirement pay claim before the BCNR. *See* SAR 1–10, 53–54, 69, 72–77, 149–63, 228–34. Mr. Jimenez did, at various points, request modification of his retirement status, but this request pertained to *regular* and *early* retirement, not *disability* retirement. *See* SAR 72–77. Mr. Jimenez did not directly assert an entitlement to disability retirement until he filed his complaint in this Court. *See* Compl. ¶¶ 76–79. But on remand, Mr. Jimenez still did not directly bring that claim before the Board; in fact, he did not even select disability as an applicable category of error or injustice on his application to the Board. *See* SAR 69 (leaving unchecked the "DISABILITY" box).

Moreover, the BCNR did not read Mr. Jimenez's application as claiming entitlement to disability retirement benefits. *See* SAR 1–10 ("This is in request to your application for correction of your naval record pursuant to Section 1552 of Title 10, United States Code."). "Indeed, the BCNR's decision itself gives no indication that the Board interpreted Mr. Jimenez's application on remand as seeking a disability retirement." Def.'s Mot. & Resp. at 19. Although Mr. Jimenez argues that the Board *should* have read his request for either "modification of his retirement status" or "medical discharge" as inclusive of disability retirement—the Board did not in fact acknowledge such a disability retirement claim nor evaluate it.[5] *Compare* SAR 69 (writing in Section 13 that Mr. Jimenez is "requesting . . . the correction of military records to reflect medical discharge in 2015, or at the latest, 2020"), *and* Pl.'s Resp. & Reply at 4–5 ("Mr. Jimenez adequately pursued his disability retirement claim . . . [he] requested relief in the form of a modification to his retirement status, which is inclusive of disability retirement."), *with* SAR 1–10 (no mention nor analysis of disability retirement pay statutes, regulations, or factors). Notably absent from the Board's decision is any reference to 10 U.S.C. § 1202 or any discussion of the fitness factors applicable to determining eligibility for disability retirement pursuant to that statute. *See* SAR 1–10 (discussing factors only as applied to discharge relief but not entitlement to disability retirement); Def.'s Mot. & Resp. at 19 ("The decision does not refer to any disability statute, regulations, enclosures, or evidence to suggest that the Board evaluated such a claim for disability.").

---

[5] Mr. Jimenez argues that the Board's "failure to address [his] disability retirement request is a deemed denial of that request." Pl.'s Resp. & Reply at 4–5. Because the Court finds that Mr. Jimenez never directly sought review of his entitlement to disability retirement, it also declines to find that the Board's failure to render a decision on such an entitlement was deliberate. *See Melendez Camilo*, 642 F.3d at 1045 (holding that the Court presumes that BCNR's are valid and performed "according to the regulations and considered all of [plaintiff's] records"); *Dodson*, 988 F.2d at 1204 ("[M]ilitary administrators are presumed to act lawfully and in good faith.").

10

At most, Mr. Jimenez's request for disability retirement is merely implied. But the Federal Circuit in *Evans* rejected the argument that an implied claim for benefits is sufficient to confer jurisdiction, holding instead that "absent initial consideration of a request for disability retirement benefits by a competent military board, the Court of Federal Claims is unable to entertain such a claim." *Evans v. United States*, 748 F. App'x 979, 983 (Fed. Cir. 2018) (affirming the Court of Federal Claims holding that it "lacked jurisdiction to consider Mr. Evans's claim for military disability retirement benefits because he never submitted an initial request for such benefits to a competent military board"). In that case, Mr. Evans argued that his request for disability retirement was an implied part of his discharge upgrade claim. *Id.* at 982–83. The Federal Circuit disagreed, noting it was "unaware of any law or regulation authorizing or articulating the definition of an implied submission for benefits." *Id.* at 983; *see also Mullen v. United States*, No. 23-cv-43, 2023 WL 8650152 at *2 (Fed. Cl. Dec. 14, 2023) ("Plaintiff has not raised a claim for disability retirement in any of his appearances before the [military corrections board] and is thus precluded from doing so here."). Nothing in the record here supports a different conclusion than that in *Evans*.

In sum, the Court holds that it must dismiss Mr. Jimenez's disability retirement pay claim for lack of subject-matter jurisdiction because a first competent board has not yet evaluated that claim.[6] *Chambers*, 417 F.3d at 1227.

## II. The BCNR Professed To But Did Not Fully Apply Liberal Consideration To Mr. Jimenez's Challenge To the Decision Not To Continue His Military Service Thereby Violating the Statutory and Regulatory Requirements.

Federal law requires the Board to give "liberal consideration" to certain claims filed by former service members. Specifically, 10 U.S.C. § 1552(h) provides as follows:

> (h)(1) This subsection applies to a former member of the armed forces whose claim under this section for review of a discharge or dismissal is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration, and whose post-traumatic stress disorder or traumatic brain injury is related to combat or military sexual trauma, as determined by the Secretary concerned.
>
> (2) In the case of a claimant described in paragraph (1), a board established under subsection (a)(1) shall—

---

[6] Because the Court holds that Mr. Jimenez's disability retirement pay claim has not yet accrued, the Court declines to consider Mr. Jimenez's arguments that BCNR's decision was also arbitrary because it "failed in its obligations under SECNAVINST 1850.4E [in] deny[ing] Mr. Jimenez the fitness determination required for a denial of military medical retirement pay" and because it did not actually afford Mr. Jimenez's alleged military sexual trauma experience the requisite "liberal consideration." Pl.'s Mot. at 16.

11

>(A) review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and
>
>(B) review the claim *with liberal consideration* to the claimant *that post-traumatic stress disorder* or traumatic brain injury potentially *contributed to the circumstances resulting in the discharge or dismissal* or to the original characterization of the claimant's discharge or dismissal.

10 U.S.C. § 1552(h) (emphasis added). That statute codifies a series of memoranda issued by Department of Defense officials to guide military correction boards' review of service member claims seeking changes in military records based on PTSD or traumatic brain injuries. *See Doyon v. United States*, 58 F. 4th 1235, 1238–39 (Fed. Cir. 2023).

Mr. Jimenez contends that the BCNR failed to afford liberal consideration to his allegations of military sexual trauma and associated mental health conditions, despite purporting to apply that standard, and thereby violated applicable law and DoD policy. The parties dispute whether Mr. Jimenez has preserved that argument, whether liberal consideration applies to correction boards' review of non-continuation decisions, and whether the Board's analysis reflects liberal consideration. The Court will consider those issues in turn below.

### A.  Mr. Jimenez Has Not Waived the Liberal Consideration Argument.

The United States argues that Mr. Jimenez has waived any argument that the BCNR failed to afford liberal consideration to his allegations of military sexual trauma and associated mental health conditions[7] because Mr. Jimenez did not make that argument in his principal brief in support of the pending cross-motion as specifically applied to his non-continuation claim. *See* Def.'s Mot. and Resp. at 27–28. Mr. Jimenez counters that the United States has misconstrued the law. *See* Pl.'s Resp. and Reply at 12. The Court declines to find waiver in this instance.

"Arguments not presented in a party's principal brief to the court are typically deemed to have been waived." *Ironclad /EEI v. United States*, 78 Fed. Cl. 351, 358 (2007); *see also Sarro & Associates, Inc. v. United* States, 152 Fed. Cl. 44, 58 (2021) ("A party's failure to raise an argument in an opening or responsive brief constitutes waiver."). That rule is rooted in fairness considerations and typically is invoked when a party first raises an argument in a reply brief to which the opposing party cannot respond. *See, e.g., Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002) (declining to reach argument first raised in reply brief due to "litigation fairness" and procedural concerns); *Insight Public Sector, Inc v. United States*, 157 Fed. Cl. 416, 431 (2021) (finding plaintiff waived argument raised for first time in its reply brief). This form of waiver is "not governed by a rigid rule," and exceptions are appropriate when "circumstances indicate that [deeming an argument waived] would result in basically unfair procedure." *Norman v. United States*, 429 F.3d 1081, 1091 n.5 (Fed. Cir. 2005) (quoting

---

[7] Because the Court holds that Mr. Jimenez's disability retirement pay claim has not yet accrued, it declines to consider whether BCNR should have afforded liberal consideration to that claim.

*Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 800 (Fed. Cir. 1990) ("[Waiver] is, of course, . . . a matter of [judicial] discretion [and may] not be adhered to.")).

Although Mr. Jimenez based his second request for review before the BCNR on the premise that "the Navy did not [initially] give due consideration to [his] being a sexual assault victim" when it decided his service should not be continued, SAR 218, his principal brief to this Court did not directly reassert that argument regarding his non-continuation claim. That lapse did not, however, deprive the United States of an opportunity to respond to the argument. The United States anticipated the argument and addressed it in its opening brief, Def.'s Mot. & Resp. at 27–28, and then further discussed the issue in its reply brief. *See* Def.'s Reply at 7–9. When a defendant is "able to fully respond to [the plaintiff's] contentions" in its reply brief, "the concept of waiver announced in *Novosteel* is inapplicable." *Ironclad/EEI*, 78 Fed. Cl. at 358. Indeed, it would be unfair to prevent Mr. Jimenez from raising this argument, given that he argued it before the BCNR, included it in his complaint, and both parties have addressed it in their briefing on the pending cross-motions. Accordingly, Mr. Jimenez's challenge to the BCNR's application of liberal consideration to the non-continuation decision is properly before this Court.

> B. <u>Liberal Consideration Applies To the Non-Continuation Decision That Mr. Jimenez Challenges</u>
>
>> *1. Origin and Evolution of the Liberal Consideration Standard*

In 2014, Secretary of Defense Chuck Hagel issued guidance to military correction boards concerning claims seeking to upgrade a former service member's discharge characterization based on previously undiagnosed PTSD. *See* Memorandum for Secretaries of the Military Departments from Secretary of Defense Charles Hagel (Sept. 3, 2014) at 1, 3 ("Hagel Memo") (available at secnav.navy.mil/mra/bcnr/Documents/HagelMemo.pdf). The Hagel Memo acknowledges that for some veterans, "PTSD was not recognized as a diagnosis at the time of service," and PTSD diagnoses often "were not made until decades after service was completed." *Id.* at 1. It further notes that veterans face difficulties in documenting "conditions that form a basis for mitigation in punitive, administrative or other legal actions" and establishing a "nexus" between PTSD and the "misconduct underlying the Service member's discharge with a characterization of service under other than honorable conditions." *Id.* In the interest of ensuring "fair and consistent results in these difficulty cases," the Hagel Memo established the "liberal consideration" requirement. *Id.* Specifically, it directed military correction boards to: (1) give "liberal consideration" to treatment records that document symptoms that meet the criteria for diagnosing PTSD or related conditions; (2) give "liberal consideration" to finding that PTSD existed at the time of service if service records or other contemporaneous records document the existence of symptoms of PTSD or a related condition; (3) give liberal consideration in cases where civilian providers diagnose PTSD or PTSD-related conditions if there is evidence that PTSD or a PTSD-related disorder existed at the time of discharge and may have mitigated misconduct underlying a non-favorable discharge (i.e., discharge under "other than honorable conditions"); and (4) consider PTSD or related conditions mitigating factors for

13

the misconduct underlying the non-favorable discharge provided that the condition can reasonably be determined to have existed at the time of discharge." *Id.* at 3.

On August 25, 2017, Undersecretary of Defense Anthony Kurta issued another memorandum which expanded on the Hagel Memo to promote "greater uniformity amongst review boards." Memorandum for Secretaries of the Military Departments from Under Secretary of Defense for Personnel and Readiness (Performing the Duties of) Anthony Kurta (Aug. 25, 2017), Attachment at 1 ("Kurta Memo") (available at secnav.navy.mil/mra/bcnr/Documents/Clarifying-Guidance-to-Military-Discharge-Review-Boards.pdf). Unlike the Hagel Memo, the Kurta Memo includes not only PTSD, but also traumatic brain injuries ("TBIs"), and military sexual trauma experiences as potential justifications for mitigation for misconduct. *Id.* Like the Hagel Memo, the Kurta Memo explains that the more lenient liberal consideration standard is appropriate for PTSD or military sexual trauma-related correction claims because "[i]t is unreasonable to expect the same level of proof for injustices committed years ago." *Id.* at 5.

On December 12, 2017, Congress codified the liberal consideration standard into the BCNR's authorization statute when it amended 10 U.S.C. § 1552 to add sub-section (h). *See* National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 § 520, 131 Stat. 1283, 1379, 1380 (2017); 10 U.S.C. § 1552(h)(1)(B). As noted above, the statute requires that military correction boards reviewing challenges to discharge or dismissal that either wholly or partially rely on PTSD or TBI as a rationale supporting correction of records give "liberal consideration to the claimant that [PTSD] or [TBI] potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal." *Id.*

On July 25, 2018, Undersecretary of Defense Robert Wilkie issued a third policy memorandum addressing the liberal consideration standard. *See* Memorandum for Secretaries of the Military Departments from Undersecretary of Defense Robert Wilkie (July 25, 2018) ("Wilkie Memo"). The Wilkie Memo does not "mandate relief" and instead "provides standards and principles to guide [military correction boards] in application of their equitable relief authority." *Id.* That memo notes that "[r]equests for relief based in whole or in part on a mental health condition, including [PTSD]; [TBI]; or a military sexual trauma experience, should be considered for relief on equitable, injustice, or clemency grounds." *Id.*

More recently, on April 4, 2024, Undersecretary of Defense Ashish Vazirani issued a fourth policy memorandum in light of the Federal Circuit's decision in *Doyon*. *See* Ashish S. Vazirani, Clarifying Guidance to Boards for Correction of Military/Naval Records Considering Cases Involving Both Liberal Consideration Discharge Relief Requests and Fitness Determinations (April 4, 2024) ("Vazirani Memo"). The Vazirani Memo takes the position that the liberal consideration standard as codified in 10 U.S.C. § 1552 and interpreted in *Doyon*[8] does not apply to the military's fitness determinations.

---

[8] In *Doyon*, the Federal Circuit held liberal consideration applied to a veteran's petition to change his military service records to reflect that his discharge was due to PTSD rather than "personality disorder." 58 F.4th at 1237.

14

*Id*. at 1.  The Memo directs a military correction board confronted with an eligible application for medical retirement or separation due to PTSD or TBI to conduct a bifurcated review.  *Id*.  First, the board must apply liberal consideration to determine whether an upgrade or change to the narrative reason for discharge is appropriate because PTSD or TBI contributed to the circumstances resulting in discharge.  *Id*.  Second, the board must separately assess that applicant's claim of medical unfitness due to that PTSD or TBI "without applying liberal consideration to the unfitness claim or carryover of any of the findings made when applying liberal consideration."  *Id.* at 2.

### 2. *The Statute Does Not Exclude Non-Continuation Decisions From Its Scope*

The United States argues that liberal consideration does not apply to Mr. Jimenez's claims because he does not seek to change the narrative reason for his discharge or upgrade his discharge status, and instead seeks continuation on active duty or, in the alternative, disability retirement.  *See* Def.'s Mot. and Resp. at 28.  Mr. Jimenez counters that § 1552(h) applies to his claim.  *See* Pl.'s Resp. and Reply at 13.  The BCNR assumed without deciding that liberal consideration applied and then purported to apply it.  *See* SAR 5–8.

In its first iteration, under the Hagel Memo, liberal consideration was limited to review of discharge characterizations—*i.e.*, "Honorable," "General (Under Honorable Conditions)," and "Under Other Than Honorable Conditions."  *See* Hagel Memo at 1; *Doyon*, 58 F.4th at 1238.  However, the Kurta Memo expanded that scope to include "*any petition* seeking discharge relief including requests to change the narrative reason, re-enlistment codes, and upgrades from General to Honorable characterizations."  Kurta Memo, Attachment at 3 (emphasis added).  Congress legislated even more expansively when it incorporated the liberal consideration standard into Section 1552(h).  The statute directs correction boards to apply liberal consideration when reviewing a "claim under this section for review of a discharge or dismissal [that] is based in whole or in part on matters relating to post-traumatic stress disorder or traumatic brain injury as supporting rationale, or as justification for priority consideration," if the service member's alleged PTSD or TBI "is related to combat or military sexual trauma." 10 U.S.C. § 1552(h).

The United States' proposed narrow reading of the scope of liberal consideration, to encompass only changes to the nature of or narrative describing a veteran's discharge, conflicts with the plain language of Section 1552(h).  Courts "must resist reading words or elements into a statute that do not appear on its face."  *Wright v. Collins*, 145 F. 4th 1336, 1342 (Fed. Cir. 2025) (cleaned up).  Congress could have enacted language limiting liberal consideration to claims seeking to modify discharge characterizations or the narratives supporting discharge, but it did not.  Consequently, there is no basis to read such a limit into the statute.  *See TServe Alliance, Inc. v. United States*, 122 F.4th 1364, 1370 (Fed. Cir. 2024) (quoting *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993)) ("It is 'our duty to refrain from reading a phrase into [a] statute when Congress has left it out.'").  "The trigger for liberal consideration is not whether the relief sought is a [discharge] characterization upgrade; it is whether the applications are based in whole or in part on matters related to PTSD."  *Vasquez v. Driscoll*, No. 24-cv-1373, 2025 WL 1865134, at *3 (D.D.C. July 7, 2025) (cleaned up).  Mr. Jimenez's request for review of the non-

15

continuation decision is premised on the alleged impact that his alleged PTSD (arising from military sexual trauma) had on the conduct the Navy examined as part of that decision. Although this Court has not previously addressed whether liberal consideration applies to non-continuation claims involving PTSD, the Court concludes that it does. Like fitness for duty determinations and requests concerning retirement decisions, challenges to discharges based on non-continuation decisions are "not categorically excluded from the application of liberal consideration." *White v. United States*, No. 24-506, 2026 WL 120223, at *13 (Fed. Cl. Jan. 15, 2026) (concluding fitness determinations are subject to liberal consideration); *see Vasquez*, 2025 WL 1865134, at *2–*4 (concluding liberal consideration applied to veteran's request to convert his discharge into a medical retirement where veteran claimed discharge was caused by undiagnosed PTSD); *Thomas v. United States*, 175 Fed. Cl. 47, 63 n.10 (2025) ("The Court is of the view that the plain language of 10 U.S.C. 1552(h) as well as the *Doyon* decision dictate that principles of liberal consideration do apply to fitness claims").

*Doyon* does not compel a contrary conclusion. In *Doyon*, the Federal Circuit held that liberal consideration is not limited to misconduct-based discharge upgrades or modifications, but also applies to requests seeking to correct the narrative reason for a service member's discharge. 58 F.4th at 1248; *see also LaBonte v. United States*, 43 F. 4th 1357, 1374 (2022). The United States cites *Doyon* for the proposition that liberal consideration applies only to discharge upgrades and modifications or changes to a discharge narrative. *See* Def.'s Mot. & Resp. at 28. Although the Federal Circuit acknowledged that there was a second "underlying dispute about whether Mr. Doyon was unfit, rather than unsuitable, for service at the time of his discharge," it expressly declined to address whether a corrections board must apply liberal consideration to fitness for duty determinations. *Doyon*, 58 F.4th at 1248–49. The Federal Circuit was not asked to address whether challenges to non-continuation decisions should be afforded liberal consideration. This case squarely presents that question, and the Court concludes that the plain language of Section 1552(h) requires military correction boards to give liberal consideration to claims challenging service non-continuation decisions where, as here, they are based on claims of PTSD or TBI arising from military sexual trauma.[9]

### C. The BCNR Decision Does Not Actually Afford Mr. Jimenez Liberal Consideration.

Although neither Congress nor the Federal Circuit has expressly defined "liberal consideration," it is a "lenient evidentiary standard." *Doyon,* 58 F 4th at 1238–39; *see also Bussey v. Driscoll*, 131 F. 4th 756, 763 (9th Cir. 2025) (concluding that "liberal consideration" is "a lenient evidentiary standard, that is not strict or literal"). The Ninth Circuit has interpreted "liberal consideration" to "require[] the Board to resolve doubts on the § 1552(h)(2) inquiry in favor of the veteran." *Bussey*, 131 F. 4th at 763. Other courts have observed that the "liberal

---

[9] The United States does not rely on the Vazirani Memo to support its interpretation of the scope of liberal consideration. To the extent that Vazirani can be read to exclude claims like Mr. Jimenez's from liberal consideration, that would conflict with a clear statutory requirement, rendering that aspect of the Memo invalid. *See White*, 2026 WL 120223, at *13 ("[T]he Vazirani Memo is contrary to law and . . . fitness determinations are not categorically excluded from the application of liberal consideration.").

consideration" standard neither alters the burden of proof nor requires a correction board to resolve claims favorably to the servicemember. *See, e.g.*, *White*, 2026 WL 120223, at *14–15 ("[T]he liberal consideration evidentiary standard does not disturb the presumption of fitness or shift the burden of persuasion"); *Hassay v. United States*, 174 Fed. Cl. 615, 629 (2025) (noting that liberal consideration did not require the board to credit all evidence favorable to the plaintiff's claims). "Liberal consideration is an invitation to robustly engage with the evidence specifically affecting the veteran." *Bee v. United States*, No. 21-cv-1970, 2024 WL 3912596, at *19 (Fed. Cl. Aug. 23, 2024). At a minimum, it requires the Board to fully evaluate the service member's claims that PTSD or a traumatic brain injury impacted the circumstances underlying the discharge, and consider a broad array of evidence when determining whether a PTSD diagnosis or TBI exists. *See White*, 2026 WL 120223, at *15; *Jeanpierre v. United States*, 176 Fed. Cl. 11, 18–19 (2025).

Although the Board professed to apply liberal consideration to Mr. Jimenez's claims, it did so in name only. The BCNR failed to "robustly engage with the evidence specifically affecting" Mr. Jimenez's claims as required by DoD policy or to afford the evidentiary presumptions outlined by the Hagel, Kurta, and Wilkie memos. *Bee*, 2024 WL 3912596, at *19. The BCNR's purported application of "liberal consideration" to Mr. Jimenez's allegations of military sexual trauma as related to his non-continuation claim was deficient in two respects.

First, the BCNR concluded that "[Mr. Jimenez] has provided *no evidence whatsoever* to support his claim of PTSD." SAR 6 (emphasis added). The BCNR reasoned that the VA rating determination itself did not support a PTSD diagnosis and that an advisory opinion from a licensed clinical psychologist with expertise in sexual trauma also concluded that Mr. Jimenez's symptoms did not support such a diagnosis. *See* SAR 6, 68. This is simply not true—there is contrary evidence in the record arguably supporting such a diagnosis, namely, Mr. Jimenez's own statements concerning PTSD and accounts from third parties documenting post-military sexual trauma behavioral changes—BCNR just failed to afford that evidence the requisite weight. *See* SAR 57–58 (documenting Mr. Jimenez's descriptions of his condition after the military sexual trauma: "I could no longer sleep or eat or work. Despite my difficulties, I put together a report the best way that I could. . . . The period that followed was very uncertain, and I became paranoid as to how I was going to be treated and if my work was going to continue"). For instance, Mr. Jimenez states he experienced, among other symptoms, dizzy episodes, joint pain, hypervigilance, anxiety, nervousness, irritability, dizziness, imbalance, and lack of sleep. *Id.* These symptoms were severe enough that Mr. Jimenez, a previously dedicated and involved father, was forced to take a step back from parenting his children. *Id.* ("My wife took on an active role of helping our sons . . . while I coped with medical issues without understanding what has [sic] happening to me."). As documented in the record, these symptoms were also severe enough that others noticed—"in May 2019, the U.S. Navy Commander at DIA, having seen [Mr. Jimenez's] symptoms firsthand, had cause for concern for [his] mental well-being and ordered [him] to a mental health evaluation." SAR 59. Similarly, Mr. Leroy Mack, who knows Mr. Jimenez through their children's Boy Scout troop and who served as a Chaplain and confidant to Mr. Jimenez following the military sexual trauma experience, noted a concerning change in behavior as well as a retaliatory work environment that had an "immature and threatening 'locker room' atmosphere." SAR 63. Tellingly, Mr. Mack describes how pre-assault, Mr. Jimenez was "content as a husband, father, and supportive team player for our military community," noting

17

how "[Mr. Jimenez] dressed as a Super Man for a Boy Scout event . . . [i]t was a treasured moment by the kids and the adults." *Id.* But following the assault, Mr. Mack states "[Mr. Jimenez] was embarrassed" and "appeared to be burdened by [] worries," such that Mr. Jimenez stopped "engaging the Boy Scout Troop and Pack as he had done previously." *Id.* All of this record evidence could support a finding that Mr. Jimenez suffers from PTSD if afforded the appropriate consideration.

> The Kurta Memo provides in relevant part that:
>
> Evidence may come from sources other than a veteran's service record and may include . . . statements from family members, friends, roommates, co-workers, fellow servicemembers or clergy;
>
> Evidence of misconduct, including any misconduct underlying a veteran's discharge, may be evidence of a mental health condition, including PTSD; TBI; or of a behavior consistent with experiencing sexual assault or harassment; and
>
> The veteran's testimony alone, oral or written, may establish the existence of a condition or experience, that the condition or experience existed during or was aggravated by military service.

Kurta Memo, Attachment at 1, 2; *see also* Hagel Memo at 1 ("Liberal consideration will also be given in cases . . . when case records contain narratives that support symptomatology at the time of service."). The BCNR must follow the guidance in the Kurta and Hagel memoranda. *See Fisher v. United* States, 402 F.3d 1167, 1177 (Fed. Cir. 2005) ("[T]he military is bound to follow its own procedural regulations should it choose to promulgate them."). BCNR failed to assign any weight to, or meaningfully engage with, Mr. Jimenez's own testimony or the testimony of his friend and member of the clergy and similarly failed to consider that Mr. Jimenez's "change in behavior," *i.e.*, his "insubordinate" conduct was actually evidence of PTSD, rather than a spontaneous change in personality after 15 years of otherwise commendable service. Kurta Memo, Attachment at 1. Moreover, the BCNR concluded there was sufficient evidence to support a military sexual trauma experience and associated mental health trauma. Since there is plainly "evidence that [] reasonably support[s] more than one diagnosis," BCNR should have also "liberally considered [that evidence] as supporting a diagnosis for [PTSD]" but failed to do so. *Id.* at 2. Accordingly, the BCNR's reasoning is not sufficient under the liberal consideration standard.

Second, the BCNR, relying on the same evidence noted above (*i.e.* VA ratings and the psychologist's advisory opinion) similarly concluded that any nexus between Mr. Jimenez's trauma-related mental health condition, military sexual trauma experience, and the conduct which contributed to the non-continuation decision was "tenuous at best." SAR 8. BCNR based this decision, in part, on the length of time elapsed between Mr. Jimenez's military sexual trauma experience and the supposedly insubordinate behavior at issue. *See* SAR 5 ("[Mr. Jimenez's] [military sexual trauma] experience [has] minimal relevance to his case. That incident occurred several years before the events which justified his removal from the continuation list."). Accordingly, here, as above, BCNR afforded Mr. Jimenez liberal consideration only in name, but

not in fact.  The Court agrees with Mr. Jimenez that "[t]he Board's conclusion that Mr. Jimenez's outbursts, beginning in 2016 [] years after he was sexually assaulted [in 2012], were too attenuated from [that] sexual assault do[es] not reflect liberal consideration, but [rather shows] a callous disregard of the severity and impact PTSD and [military sexual trauma] ha[ve] on Mr. Jimenez."  Pl.'s Resp. & Reply at 10.  This is the very outcome that the Hagel, Kurta, and Wilkie Memos were issued to rectify and prevent—the BCNR's conclusion here is a stark departure from that guidance and renders that guidance essentially empty.  *See* Hagel Memo at 1 ("In many cases, [PTSD] diagnoses were not made until decades after service was completed . . . It has [] been extremely difficult to document conditions that form the basis for mitigation in punitive, administrative, or other legal actions *or to establish a nexus between PTSD and the misconduct underlying the [] discharge*.") (emphasis added); Kurta Memo, Attachment at 5 (BCNR should "afford each veteran a reasonable opportunity for relief even if the sexual assault . . . was unreported or the mental health condition was not diagnosed until years later").  As this Court has emphasized, "the [DoD] has recently recognized, because disorders like PTSD were until recently not well understood, they are often not diagnosed until many years after they manifest themselves."  *Hassay*, 150 Fed. Cl. at 480.

Moreover, the BCNR gave very little, if any, weight to Mr. Jimenez's own statements, or statements from third parties, that his military sexual trauma experience and resulting symptoms contributed to the alleged inappropriate behavior.  SAR 57–58 (Mr. Jimenez states that his hypervigilance and anxiety resulted in "difficulty with [his] [] supervisors that was certainly taken as disrespectful").  Nor did the BCNR afford any weight to either Mr. Jimenez's own or Mr. Mack's testimony concerning the potentially retaliatory work environment, simply concluding that because none of Mr. Jimenez's then-supervisors should have known about the sexual assault, that those individuals could thus not have been engaging in discriminatory or bullying type behavior.  *See* Hagel Memo at 1 ("Liberal consideration will also be given where [evidence] . . . may reasonably indicate that PTSD or a PTSD-related disorder existed at the time of discharge which might have mitigated the misconduct."); Kurta Memo, Attachment at 2 ("The veteran's testimony alone . . . may establish . . . that the condition or experience excuses or mitigates the discharge. . . . Conditions or experiences that may reasonably have existed at the time of discharge will be liberally considered as excusing or mitigating that discharge.").

In sum, the BCNR's professed application of liberal consideration to Mr. Jimenez's claims does not adhere to the principles outlined in the Hagel, Kurta, or Wilkie Memoranda.  The Board's failure to truly afford liberal consideration to Mr. Jimenez's claims requires remand.  *See Hassay*, 150 Fed. Cl. at 484–85; *Jeanpierre*, 176 Fed. Cl. at 35–36; *White*, 2026 WL 120223, at *19–20.

## CONCLUSION

For the reasons set forth herein, the Court lacks subject-matter jurisdiction over Mr. Jimenez's disability retirement claim and it is subject to dismissal pursuant to RCFC 12(b)(1).  The Court further concludes that the BCNR misapplied the liberal consideration standard as to Mr. Jimenez's non-continuation claim.  Having now provided the rationale for the Court's Order **GRANTING IN PART** the Government's Motion to Dismiss and Cross Motion for Judgment on the Administrative Record, ECF No. 30, and **GRANTING IN PART** Mr.

Jimenez's Motion for Judgment on the Administrative Record, ECF No. 29, the Court hereby **REMANDS** the case to BCNR for 180 days for reconsideration of Mr. Jimenez's non-continuation claim.  In conducting its review, the Board shall, consistent with this Opinion:

1. evaluate and consider, applying the liberal consideration standard cited above, whether Mr. Jimenez has sufficiently demonstrated that he may have had PTSD at the time of his discharge;

2. apply the liberal consideration standard cited above concerning whether Mr. Jimenez's military sexual trauma and/or PTSD in any way mitigated the "insubordinate" conduct that led to the Navy's non-continuation decision; and

3. evaluate and consider, applying the liberal consideration standard cited above, whether Mr. Jimenez's military sexual trauma experience resulted in any workplace retaliation that might mitigate the "insubordinate" conduct that led to the Navy's non-continuation decision.

On remand, Mr. Jimenez shall be permitted to introduce any evidence relevant to the issues before the Board, or to assert any new claims not previously decided by the BCNR.  The remand proceedings must be completed within 180 days of the date of this decision.  The parties shall file a joint status report every sixty (60) days advising the Court on the status of the proceedings on remand.

The Court will retain jurisdiction over the case during the course of the proceedings on remand.  The Court hereby **STAYS** proceedings in the instant case.  Pursuant to RCFC 52.2(e), the parties shall file notice with the Court within thirty (30) days of the Board's decision on remand stating whether or not that decision affords a satisfactory basis for the disposition of the case and whether the parties require further proceedings before the Court.

The Clerk of the Court is directed to serve a copy of this decision to:

Elizabeth Hill
Department of the Navy
Board for Correction of Naval Records
701 S. Courthouse Road, Suite 1001
Arlington, VA 22204-2490

**IT IS SO ORDERED.**

ROBIN M. MERIWEATHER
Judge